# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF KANSAS

**LOHMANN & RAUSCHER, INC.,**

        **Plaintiff,**

**v.**                                  **Case No. 05-2369-JWL**

**YKK (U.S.A.) INC.,**

        **Defendant.**

## MEMORANDUM AND ORDER

This lawsuit involves claims by plaintiff Lohmann & Rauscher, Inc. ("LRUS")[1] against

defendant YKK (U.S.A.) Inc. ("YKK").[2]  LRUS alleges damages for breach of contract, breach

of express warranty, and breach of the implied warranties of merchantability and fitness for a

particular purpose in connection with "hook and loop" straps[3] that YKK sold to LRUS.  LRUS

incorporated these straps into orthopedic supports and braces which LRUS manufactured

exclusively for its customer, Innovation Sports, Inc. ("IS").  LRUS claims are based upon an

allegation that  there was a latent defect in the weld (the fused area) joining sections of the straps

---

[1]LRUS is a Kansas corporation with its principal place of business in Topeka, Kansas.

[2]YKK is a New York corporation with its principal place of business in Marietta, Georgia.

[3]"Hook and loop" refers to material similar to that manufactured under the trade name "Velcro."

together.  This matter is currently before the court on defendant's motion for summary judgment (doc. 81) and motion to exclude the testimony of plaintiff's expert on liability, Donald Duvall (doc. 89).[4]  A hearing regarding these motions was held on March 1, 2007.  At that hearing, the parties responded to questions posed by the court and Dr. Duvall testified.  For the following reasons, YKK's motion to exclude testimony (doc. 81) is denied with respect to Dr. Duvall; YKK's motion for summary judgment is granted in part and denied in part.[5]

## I.      Defendant's Motion for Summary Judgment

*A.      Statement of Material Facts*[6]

LRUS makes and distributes medical products, including orthopedic supports and braces. YKK manufactures and sells fasteners, including hook and loop fasteners, which YKK sells under the trade name Cosmoline.  LRUS and YKK had an agreement whereby YKK agreed to manufacture welded hook and loop straps for sale to LRUS.  LRUS incorporated these straps in orthopedic supports and braces it manufactured for sale to Innovation Sports, Inc. ("IS").  IS had

---

[4]The court denies defendant's motion for leave to file supplemental statement of facts in support of these motions (doc. 111).  When the parties agreed to schedule depositions after the motions were filed, they ran the risk that testimony from those depositions likely would not be part of the summary judgment record.  Furthermore, at the hearing held by the court on March 1, the court intended to provide the parties an opportunity to explain the evidence already in the record, not to introduce new evidence.

[5]YKK's motion to exclude in part the testimony of Mike Hall was granted in part and denied in part on the record at the hearing.

[6]Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to LRUS, the nonmoving party.

a manufacturing agreement with LRUS,[7] whereby LRUS would manufacture orthopedic braces for sale to IS.  The agreement contained a minimum purchase requirement, whereby IS agreed to purchase $250,00 worth of products from LRUS for the first three years of the agreement, beginning in 2001. The agreement also gave LRUS the discretion to replace, repair, or furnish credit to IS for any products it found to be defective.  LRUS and IS ultimately agreed to extend the manufacturing agreement until December 31, 2006.

Because of the specifications set forth in its manufacturing agreement with IS, LRUS determined it would use welded straps rather than the sewn straps it had used in the past.  LRUS contacted YKK about manufacturing welded straps for its braces and discussions ensued about pricing and specifications.  Paul Meyer was the salesperson for YKK who engaged in discussions with LRUS regarding LRUS's purchase of welded hook and loop straps from YKK. During these discussions, Mr. Meyer responded affirmatively to LRUS's inquiries about its ability to manufacture welded straps.  YKK then produced a number of sample welded straps for LRUS, based upon its specifications.  Those specifications, in addition to requiring welded straps, included length, width, color, loop direction, and tongue cut of each strap.  There was no specification requiring a particular weld strength.

After two rounds of inspection and testing of samples by both LRUS and IS, LRUS sent purchase orders for straps to YKK; LRUS received its first shipment of welded straps from YKK in February 2002.  The straps were manufactured in three different widths: one inch, one and a

_____

[7]The initial manufacturing agreement was actually formed between IS and LRUS's predecessor, Smith Orthopedics.

half inch, and two inches.  Upon receipt, the straps were inspected by LRUS's plant inspectors for quality and condition prior to being incorporated into the orthopedic braces.  The LRUS plant inspectors examined, inspected, and tested the braces, after the straps were incorporated, for quality and condition before packing and shipping them to IS.

In January 2004, IS notified LRUS that its customers had complained about certain straps on LRUS's braces peeling apart at the weld.  LRUS notified YKK of the complaint in late January 2004 or early February of 2004 and provided YKK with straps for inspection to determine the cause of the alleged defect.  YKK was unable to determine from which of its plants the straps had originated.  In February of 2004, YKK sent LRUS a Quality Concern Report stating that the "root cause" of the defective welds was:

> Inadequate M/C set-up caused by one of 2 reasons.  Either during set-up process, the proper gap between horn and anvil was not properly established (proper clearance between horn and anvil at point of impact was not achieved) or the energy level at the control box was set too low a temperature.  Either of these factors would create a weak weld.

LRUS forwarded this report to IS, who had one of its engineers test the straps, subjecting the strap welds to both a straight pull test and a peel test.  In October of 2004, IS's engineer sent LRUS a letter, stating his ultimate conclusion that, based on the tests he conducted, the products in IS's inventory were not suitable for sale.

LRUS quarantined its remaining inventory of straps as well as its inventory of finished braces.  IS also quarantined its inventory of braces.  LRUS then began reworking the straps incorporated into the braces, which involved cutting the weld and tongue end off each strap and

4

sewing a replacement tongue back on the strap. LRUS also agreed with IS to halt all further production of braces with welded straps.

In August of 2005, LRUS filed this lawsuit against YKK, alleging claims for breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, and breach of implied warranty of merchantability. LRUS seeks damages for past and future out of pocket costs and for lost profits.

B.     *Summary Judgment Standard*

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local* 382, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way."   Haynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material' when "it is essential to the proper disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point

out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id*. (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

C.      *Analysis*[8]

1.      Notice

The court will first address YKK's argument that because LRUS failed to notify YKK of the defects in the straps within a reasonable time after the breach was discovered or should

---

[8]To the extent the court cites case law from other states, the court emphasizes that "[b]ecause the UCC is intended to be applied uniformly across the various states, courts routinely turn to decisions from other states when there is no case law on point within the relevant jurisdiction." *National Environmental Service Co. v. Ronan Engineering Co.*, 256 F.3d 995, 1004 (10th Cir. 2001).

have been discovered as required by K.S.A. § 84-2-607(3), LRUS is precluded from recovering any damages.  YKK first raised this defense in its summary judgment motion.  LRUS argues, however, that YKK's failure to preserve this defense in the Pretrial Order constitutes a waiver of this defense and the court agrees.  *See Kay-Cee Enterprises, Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 846-47 (D. Kan. 1999)("'The pretrial order supersedes the pleadings and controls the subsequent course of litigation.'")(quoting *Hullman v. Board of Trustees of Pratt Comm. College*, 950 F.2d 665, 667 (10th Cir.1991); Fed. R. Civ. P. 16(e)).

YKK argues that by raising the defenses of waiver and estoppel, it has adequately preserved the defense of notice under K.S.A. § 84-2-607(3).  The waiver and estoppel defenses asserted in the Pretrial Order, however, allege that LRUS's inspection and acceptance of the straps constituted waiver and estoppel.  They do not refer to the timeliness of LRUS's notification to YKK regarding the defectiveness of the straps. The court recognizes that the Pretrial Order should "be liberally construed to cover any of the legal or factual theories that might be embraced by their language." *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979).  In this situation, however, the characterization of YKK's waiver and estoppel defenses was insufficient to put LRUS on notice regarding any defense by YKK under K.S.A. § 84-2-607(3).  Furthermore, at this late stage of the litigation, the court denies YKK's alternative request to amend the Pretrial Order to include this defense.  Accordingly, the court need not address YKK's defense regarding notice.

2.      Count I: Breach of Contract

7

The Pretrial Order sets forth LRUS's breach of contract claim as follows: "[t]he face straps sold by YKK to LRUS were not fit for use with LRUS's braces and therefore did not conform to the agreement as contemplated by the parties." YKK argues that this claim mirrors the allegations in LRUS's breach of warranty claims and is therefore precluded because it is redundant. LRUS argues that it should be allowed to proceed with its breach of contract claim because it is allowed to assert alternative theories of recovery.[9] The case LRUS cites in support of this argument, however, dealt with a motion to dismiss an allegedly redundant claim, and the district court held that *at that stage of the litigation* it would not compel the plaintiff to elect one remedy over another. *See Fink v. DeClassis*, 745 F. Supp. 509, 515 (N.D. Ill. 1990). On the other hand, another district court granted summary judgment on a plaintiff's breach of contract claim, where "the suit [was] close to trial, and [the plaintiff] offer[ed] no argument that the breach of contract claim [was] somehow factually distinct from the breach of warranty claims." *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 982-83 (E.D. Wis. 1999).

In this case, there is no distinction between the allegation embodied in the generic breach of contract claim and those allegations set forth in the breach of implied warranty and express warranty claims. Rather than asserting an alternative basis for its breach of contract claim, such as that the products were not timely delivered, LRUS makes allegations identical to those

---

[9]LRUS also argues that it should be able to proceed with its breach of contract claim because it requires proof of elements different from those required to be proven in its warranty claims. After noting that the Pretrial Order provides that its claims are governed by the UCC, LRUS cites to a Kansas case setting forth the elements for a *common law* breach of contract claim, *Commercial Credit Corp. v. Harris*, 510 P.2d 1322 (Kan.1973). Accordingly, the court concludes this argument is without merit because a common law breach of contract claim is not at issue in this case.

8

embodied in its breach of warranty claims: the straps were unfit for their intended purpose. Because this issue is before the court on defendant's motion for summary judgment, and LRUS has not put forth evidence from which a reasonable inference could be drawn that its breach of contract claim is factually distinct from its breach of warranty claims, the court concludes the plaintiff is precluded from asserting its generic breach of contract claim as a matter of law.[10] Accordingly, the court grants YKK's motion for summary judgment with respect to Count I.

3.      Count II: Breach of Express Warranty

The Kansas statute pertaining to express warranties under the U.C.C. provides:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

K.S.A. § 84-2-313.

YKK argues that LRUS cannot establish that YKK made an express warranty because

---

[10]As the parties concede in their briefing, the applicable statute of limitations in this case is four years, as indicated in K.S.A. § 84-1-725.  Accordingly, any argument by YKK that the statute of limitations has run is rejected.

9

any statements made by YKK's employees with respect to the welded straps was merely "opinion or commendation" and thus insufficient to create an express warranty.  LRUS has put forth evidence, however, that YKK made express warranties regarding the welded straps through brochures, pictures, and statements made by Paul Meyer, the YKK salesperson who negotiated with LRUS.  Viewing this evidence in the light most favorable to LRUS, this evidence is sufficient to demonstrate a genuine dispute as to whether any express warranties were made by YKK.  The court concludes that a reasonable trier of fact could infer from this evidence that YKK made an express warranty to LRUS regarding the straps; thus, the court denies YKK's motion for summary judgment with respect to Count II.

4.      Count III: Breach of Implied Warranty of Merchantability

YKK contends that summary judgment is appropriate with respect to LRUS's claim for breach of an implied warranty of merchantability because the goods in this case were specially manufactured and thus had no ordinary purpose. YKK further contends that if the straps had a particular purpose, as LRUS alleges in Count IV, they cannot also have an ordinary purpose. In response, LRUS argues that it may maintain claims for both breach of implied warranty of fitness for a particular purpose and breach of implied warranty of merchantability.

In Kansas, the relevant statute pertaining to the implied warranty of merchantability provides: "(1) . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . (2) Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purpose for which such

10

goods are used . . . ." K.S.A. § 84-2-314.   "To demonstrate a breach of the implied warranty of merchantability, plaintiff must show that the goods were defective, that the defect was present when the goods left the manufacturer's control, and that the defect caused the injury sustained by plaintiff." *Dieker v. Case Corp.*, 276 Kan. 141, 146-47, 73 P.3d 133 (2003).

Implied warranties arise by operation of law, not by agreement of the parties. *Limestone Farms, Inc. v. Deere & Co.*, 29 Kan.App.2d 609, 614, 29 P.3d 457 (2001).   Accordingly, the implied warranty of merchantability is implied in any sale of goods by a merchant. *See* K.S.A. § 84-2-314. YKK has not disputed that it is a merchant with respect to the straps in question in this case nor has it disputed that the straps were goods.   Accordingly, there existed an implied warranty of merchantability.   YKK argues that an implied warranty of merchantability cannot co-exist with an implied warranty of fitness for a particular purpose.   However, YKK has not cited, nor has the court located, any cases holding that a claim for breach of an implied warranty of fitness for a particular purpose precludes a claim for breach of an implied warranty of merchantability.

LRUS's contends not only that the straps were unfit for a particular purpose, that is, incorporation into LRUS's braces, but also that they were not fit for their ordinary purpose.   In making this contention, LRUS alleges that the straps came apart when they should not have.   The court finds this sufficient evidence from which a reasonable trier of fact could conclude that the straps had an ordinary purpose, that is, that the straps would hold in place whatever it was they were intended to secure.   Thus, LRUS's claim for breach of the implied warranty of

11

merchantability is not precluded as a matter of law; YKK's motion for summary judgment with

respect to Count III is denied.

5.      Count IV:  Breach of Implied Warranty of Fitness for a Particular Purpose

        In Kansas, an implied warranty of fitness for a particular purpose is defined as follows:

> Where the seller at the time of contracting has reason to know any particular
> purpose for which the goods are required and that the buyer is relying on the
> seller's skill or judgment to select or furnish suitable goods, there is unless
> excluded or modified under the next section an implied warranty that the goods
> shall be fit for such purpose.

K.S.A. § 84-2-315 (2005).  For this warranty to arise, "(1) the seller must have reason to know

of the buyer's particular purpose for the goods; (2) the buyer must rely on the seller's expertise

in furnishing goods suitable for the buyer's purpose; and (3) the seller must have reason to know

of the buyer's reliance."  K.S.A. § 84-2-315 cmt. 2.

        YKK first argues YKK's breach of implied warranty of fitness for a particular purpose

claim must fail because LRUS did not rely on YKK's expertise in furnishing straps necessary

for LRUS's particular purpose.  Rather, YKK alleges, it manufactured the straps according to

specifications provided by LRUS, which included welded joints, length, width, color, loop

direction and tongue cut of each strap.  YKK further argues that LRUS, not YKK, was in the

business of manufacturing braces and face straps; therefore, according to YKK, LRUS had the

expertise with respect to the forces exerted on face straps incorporated into orthopedic braces

and the tensile strength necessary to withstand such forces.

        YKK cites to *Hendricks v. Comerio Ercole*, 763 F. Supp. 505 (D. Kan. 1991), in support

12

of its argument regarding the specifications provided by LRUS.  In *Hendricks*, the district court applied Kansas law and granted the seller's motion for summary judgment with regard to the plaintiff's claim for breach of implied merchantability of fitness for a particular purpose because it was undisputed that the buyer provided specifications which "left no apparent room for the exercise of judgment by [the seller]."  *Id*. at 513.

The court does not find *Hendricks* persuasive, however, because the facts in this case do not indicate that the specifications provided by LRUS "left no apparent room for the exercise of judgment" by YKK.  *See Aluminum Co. of America v. Electro Flo Corp.*, 451 F.2d 1115, 1119 (10th Cir. 1971) (holding that an implied warranty of fitness for a particular purpose does not arise in connection with goods manufactured to a buyer's specifications only when "the buyer furnishes precise technical specifications").  Other than indicating that it wanted welded straps, LRUS contends that it gave YKK no specifics regarding the actual weld itself and YKK does not argue to the contrary.  Furthermore, LRUS states that although it had sewn hook and loop pieces together before, it had never used welded straps before, which is why it allegedly relied on YKK's expertise regarding the welded straps.  Therefore, the court concludes that LRUS has put forth sufficient evidence from which a reasonable trier of fact could infer that it relied on YKK's expertise regarding the welded straps.

YKK also makes a bare assertion that it had no reason to know of LRUS's reliance.  It is uncontroverted, however, that LRUS specifically requested that the straps be welded.  Because it would not be unreasonable for a trier of fact to infer from this specific request by LRUS that

13

YKK had reason to know of LRUS's reliance upon YKK's expertise regarding welded straps, the court concludes there is a genuine dispute of material fact on this issue.

Finally, YKK alleges that it is entitled to summary judgment on this claim because LRUS's allegations that the straps were not fit for the particular purpose are based on hearsay and other inadmissible evidence. YKK does not make any contention, however, regarding the admissibility of YKK's own quality concern report, which indicates the "root causes" of the defective welds. On this record, then, the court could find this report and the inferences which can be drawn from it, when viewed in the light most favorable to LRUS, are in and of themselves sufficient to indicate a genuine issue of material fact with regard to the alleged defectiveness of the straps. When taken together with the opinion of Dr. Duvall, which the court declines to strike, below, YKK's motion for summary judgment with respect to Count IV clearly must be denied.

6.    Damages

Finally, YKK argues that LRUS is not entitled to recover incidental or consequential damages in this case and therefore, YKK is entitled to summary judgment with respect to the issue of damages. YKK specifically argues that LRUS's failure to mitigate precludes it from recovering incidental and consequential damages. Further, YKK alleges that LRUS may not recover consequential damages because it failed to comply with the Amended Scheduling Order and because LRUS's lost profits claims are based on guesses and assumptions.

a.    Mitigation

14

The following provision governs the incidental and consequential damages recoverable by a buyer under the U.C.C. in Kansas:

> (1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach include
>
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
>
> (b) injury to person or property proximately resulting from any breach of warranty.

K.S.A. § 84-2-715.  "Built into paragraph (2)(a) are the familiar contract damage limitations of . . . mitigation ("could not reasonably be prevented by cover or otherwise.").  K.S.A. § 84-2-715 cmt. 3.  The Kansas Supreme Court has held that a buyer's failure to "utilize the remedy of cover when such is reasonably available will preclude recovery of consequential damages, such as loss of profits."  *Panhandle Agri-Service, Inc. v. Becker*, 231 Kan. 291, 298, 644 P.2d 413 (1982).

YKK argues that LRUS failed to mitigate because it chose to rework the orthopedic braces despite the fact that the agreements with IS imposed no such obligation upon LRUS, thus LRUS allegedly incurred unnecessary costs.  LRUS contends that it decided to rework the braces to comply with the manufacturing agreement with IS because it "take seriously its legal obligation to provide goods that conform to sales contracts."  Viewing this evidence in the light most favorable to LRUS, a reasonable trier of fact could infer that LRUS utilized a reasonably available method to deal with what it believed were defective welds, and therefore is not

15

precluded as a matter of law from recovering consequential damages.

YKK further argues that LRUS failed to mitigate damages by choosing not to enforce the minimum purchase requirement provision in its manufacturing agreement with IS.  LRUS alleges that the decision not to enforce that provision was a sound business decision in light of the allegedly defective products LRUS had supplied to IS.  Viewing this evidence in the light most favorable to YKK, a reasonable trier of fact could conclude that LRUS's decision to refrain from enforcing the minimum purchase requirements did not constitute an unreasonable failure to mitigate damages.  Therefore, YKK has failed to show that it is entitled to judgment as a matter of law on this issue and YKK's motion for summary judgment regarding LRUS's failure to mitigate is denied.

b.    Consequential Damages

In determining consequential damages, "a court or jury merely needs to be guided by some rational standard.  This rational standard should be determined according to each individual case so that the claimant provides the best available evidence the situation allows." *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 763, 915 P.2d 86 (1996).  In *Olathe Mfg.*, the court described *Vickers v. Wichita State University*, 213 Kan. 614, 518 P.2d 512 (1974), as "the key Kansas case in the area of lost profits" and cited it as follows:

> The evidence necessary in establishing lost future profits with reasonable certainty 'must depend in a large measure upon the circumstances of the particular case . . . .'  Absolute certainty in proving loss of future profits is not required. What is required is that the court or jury be guided by some rational standard. As to evidentiary matters a court should approach each case in an individual and

16

> pragmatic manner, and require the claimant furnish the best available proof as to
> the amount of loss that the particular situation admits. It is the responsibility of a
> district court to see that speculative and problematical evidence does not reach the
> jury.

*Olathe*, 259 Kan. at 764, 915 P.2d at 104 (quoting *Vickers*, 213 Kan. at 620, 518 P.2d

512)(citations omitted).

The court concludes that YKK has failed to show that there is not a genuine dispute

regarding this issue at this stage of the litigation.  LRUS has presented evidence that because of

YKK's conduct, LRUS's relationship with IS has been damaged, resulting in a loss of future

profits to LRUS.  At this time, the court will not deny LRUS the opportunity to present such

evidence regarding consequential damages because "absolute certainty in proving loss of future

profits is not required" and YKK has failed to establish that the standards which LRUS has

presented to guide the court or jury on this issue are so irrational that YKK is entitled to

judgment as a matter of law.[11]  Accordingly, YKK's motion for summary judgment with respect

to LRUS's claim for consequential damages is denied.

In sum, the court grants YKK's summary judgement motion with respect to Count 1.  The

motion is denied with respect to Counts 2, 3, and 4.  The court notes, however, that although

LRUS is entitled to proceed to trial on all three of its breach of warranty claims, duplicative

recovery based on these claims is prohibited.  Finally, the court denies YKK's summary

judgment motion with respect to damages as well.

---

[11]YKK is not precluded, of course from raising this argument at trial when it becomes more
clear what evidence LRUS intends to present regarding lost profits.

17

**II.     Defendant's Motion to Exclude Testimony of Plaintiff's Experts**

*A.      Background*

Donald Duvall is a senior consultant with Engineering Systems, Inc., located in Aurora, Illinois, and has a doctorate in metallurgical and materials engineering from the Illinois Institute of Technology.  Dr. Duvall's resume states that he is a polymer materials scientist with more than 32 years of experience in the plastics industry.  LRUS retained Dr. Duvall as an expert witness in this case to evaluate the performance and alleged defects in the straps supplied to LRUS by YKK.

LRUS sent a number of straps to Dr. Duvall, who then sent the straps to the laboratory at L.J. Broutman & Associates, located in Chicago, Illinois, for testing.  Dr. Duvall did not participate in the testing, nor did he personally observe the testing.  Dr. Duvall provided oral, rather than written instructions, to Dale Edwards, a senior engineer at Broutman, indicating that he wanted the laboratory to test the peel strength of the straps by manually separating one end sufficiently to place it in the grips of the Instron (the testing machine) and then run the machine and measure the force required to peel the welded straps apart.  Mr. Edwards sent a letter to Dr. Duvall, stating how the test was performed and indicating the results of the testing.  From these results, Dr. Duvall ultimately determined that approximately 30% of the welds failed at peak loads of less than four pounds of force, which Dr. Duvall opined was the minimum peel test peak load necessary for a weld to function in actual use.

*B.      Standard*

18

Federal Rule of Evidence 702 provides that an expert qualified "by knowledge, skill, experience, training, or education" may testify about "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue" and if "(1) the testimony is based upon sufficient facts or data, (2) testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts." Fed. R. Ev. 702. In order to determine that an expert's opinion is admissible, a district court should, first, determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render an opinion and, second, the court should determine "whether the witness' opinions are 'reliable' under the principles set forth under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule. Fed. R. Evid. 702 advisory committee notes.

In *Daubert*, the Supreme Court explained that Rule 702 assigns to the district judge a gate-keeping role to ensure that scientific testimony is both reliable and relevant. *Daubert*, 509 U.S. at 597; *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999). The district judge must, first, determine whether the proffered testimony is reliable, requiring an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and, second, determine whether that reasoning or methodology can be properly applied to the facts in issue. *Daubert*, 509 U.S. at 592-93.  The *Daubert* Court listed four factors relevant to

19

assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance. *Id.* at 592-94.  In *Kumho Tire*, the Court emphasized that these four factors are not a "definitive checklist or test" and a court's inquiry into reliability must be "tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150. According to the Court, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

C.    *Analysis*

YKK does not contend that Dr. Duvall is not qualified to render an opinion in this case; furthermore, after examining Dr. Duvall's resume and qualifications, the court concludes that Dr. Duvall's "knowledge, skill, experience, training and education" qualify him to offer his opinion as an expert in this case.  Accordingly, the court must determine only whether Dr. Duvall's testimony is reliable under the principles set forth in *Daubert*.  At the hearing, it became clear to the court that YKK offers four main contentions regarding the admissibility of Dr. Duvall's testimony: (1) he did not personally participate in the testing upon which he bases his opinions, (2) the four pound standard relied upon by Dr. Duvall is arbitrary, (3) the t-peel test utilized by Dr. Duvall was the inappropriate test to be applied in the circumstances of this case, and (4) initially separating the welds by hand impermissibly compromised the strength of the welds.

20

As an initial matter, the court notes that the type of testing performed by Dr. Duvall, t-peel testing, has not been widely evaluated by other courts.  In fact, the court has located no cases that even mention either t-peel testing or peel testing, outside of the patent context.  Because neither party has introduced evidence regarding any testing, peer review, publication, or potential rates of error associated with peel testing, the court does not find the specifically enumerated *Daubert* factors to be particularly helpful in this case.[12]  Therefore, the court's inquiry into reliability will be "tied to the facts of [this] particular case," rather than a strict adherence to the *Daubert* factors.

1.      Dr. Duvall's failure to participate in the testing

The court rejects YKK's first argument, regarding Dr. Duvall's failure to participate in the testing.  Fed. R. Evid. 703 provides three bases for expert opinion testimony, one of which is that "the expert may rely on facts outside the record and not personally observed, but of the kind that experts in his or her field reasonably rely on in forming opinions."  *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, (10th Cir. 1991)(citing *Ponder v. Warren Tool Corp.*, 834 F.2d 1553, 1557 (10th Cir. 1987); *Ramsey v. Culpepper*, 738 F.2d 1092, 1101 (10th Cir. 1984)).  At the hearing, Dr. Duvall testified that the results he relied upon in forming his opinions were typical of the type of information relied upon normally by others in his field.  He further stated that he chose Broutman to perform the testing because he was familiar with the laboratory, based on his being previously employed there for almost ten years and that Broutman was an

---

[12]  The court does note, however, that YKK could have replicated the testing relied upon by Dr. Duvall and offered its own analysis based upon that type of testing, but chose not to do so.

accredited institution.

Absent the introduction of any evidence to the contrary by YKK, the court does not find Dr. Duvall's testimony that experts in his field typically rely on results of tests performed by others unreliable. This conclusion is based partially upon Dr. Duvall's opinion regarding what facts experts in his field typically rely upon. The conclusion is further supported by the court's own determination that it is not unreasonable to believe that other experts in Dr. Duvall's field would form an opinion based upon the results of an independent laboratory's testing, particularly in light of Dr. Duvall's long-standing relationship with the Broutman laboratory. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 748 ("The judge can of course take into account the particular expert's opinion that experts reasonably rely on that type of data, as well as the opinions of other experts as to its reliability, but the judge can also take into account other factors he or she deems relevant.") Accordingly, any contentions YKK has regarding Dr. Duvall's reliance upon the Broutman laboratory results should be directed at the weight, not the admissibility of his opinion.

2.      The four pound standard

YKK further argues that because there is no indication that the four pound standard utilized by Dr. Duvall in evaluating the test results is an industry standard, it was an inappropriate measure of performance. At the hearing, LRUS's counsel and Mr. Duvall indicated that he was not using four pounds as an industry standard; rather, they indicated that four pounds is far less than the amount of force exerted on the welds in their normal course of

use as incorporated into the braces, and thus four pounds was chosen as a minimum level of performance. This explanation for Dr. Duvall's application of the four pound benchmark is not unreasonable or unreliable.

LRUS's explanation that the straps incorporated into the braces would be consistently subjected to at least four pounds of force is not an illogical basis for evaluating whether the straps failed at that level. YKK is certainly entitled to cross-examine Dr. Duvall on the chosen benchmark at trial if it wishes. Furthermore, YKK has not introduced any evidence showing that four pounds was *not* an acceptable point of reference. Accordingly, the court concludes that Dr. Duvall's use of a four pound benchmark in evaluating the test results does not render his expert testimony unreliable and thus will not exclude his testimony on that ground.

3.     The appropriateness of the t-peel test

YKK further argues that its expert, Dr. Robert Carbonara, opines that Dr. Duvall's utilization of a peel test was inappropriate because it fails to realistically replicate the forces experienced by the straps during use. Dr. Carbonara argues that the appropriate method for testing the welded straps in this case was the type of test he performed, a tensile test. In response to this argument, LRUS indicated at the hearing that people utilizing the braces do not merely apply in-line force on the straps, which is the type of force exerted in Dr. Carbonara's tensile test. Rather, LRUS contended, people twist and bend the straps when putting on and taking off the braces, which is more appropriately replicated by utilizing a peel test. The court does not consider this proffer by the plaintiff unreliable and thus does not find that t-peel testing is

23

irrelevant or inherently unreliable in this case. YKK, of course, is entitled to argue at trial that Dr. Carbonara's test was more appropriate. Furthermore, because the parties have not referenced, nor has the court located, any authority indicating that a particular test is specifically designed to assess the welded straps at issue in this case, the court concludes that Dr. Duvall's opinion will "assist the trier of fact to understand the evidence or to determine a fact in issue" as contemplated by Rule 702; thus, it will not exclude Dr. Duvall's testimony. *See Werth*, 950 F.2d at 648 ("[T]he 'touchstone' of admissibility [of an expert's opinion] is helpfulness to the trier of fact.").

4.      Separating the welds

YKK also argues that by initially separating the welds by hand, the strength of the welds was compromised, making it more likely that the weld would fail. In response to this argument, Dr. Duvall testified at the hearing that he instructed Broutman laboratory to only separate the welds enough to place them in the grips of the Instron machine. Dr. Duvall further testified that, because the strength of adhesion is the same across the strap, regardless of where on the strap the weld is tested, separating the weld a small amount does not affect whether the adhesion will fail. Because the court finds this testimony by Dr. Duvall is not unreliable, it will not exclude his testimony on this basis.

**IT IS ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. 81) is granted in part and denied in part. Defendant's motion to exclude expert testimony (doc.

89) is denied with respect to plaintiff's expert Donald Duvall.  Defendant's motion to supplement the record (doc. 111) is denied.

**IT IS SO ORDERED.**

Dated this 7th day of March 2007, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United Stated District Judge